**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CORDERO KADEEM RAGLAND, by and through his mother and conservator, PAMELA MITCHELL, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 2:22-cv-2862-SHL-atc |
| v. | ) ) | |
| SHELBY COUNTY, TENNESSEE, | ) ) | |
| Defendant. | ) ) | |

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Shelby County, Tennessee's Motion for Summary Judgment, filed January 29, 2024.  (ECF No. 41.)   Plaintiff Cordero Kadeem Ragland responded on February 26, 2024 (ECF No. 44) and Defendant replied on March 11, 2024 (ECF No. 52). Because there are genuine issues of material fact as to whether Plaintiff suffered a constitutional harm as a direct result of a Shelby County policy, custom or practice, the motion is **DENIED**.

## BACKGROUND[1]

### I.    Shelby County Jail

Shelby County Jail is an accredited correctional facility that is located at 201 Poplar Avenue in Memphis, TN.  Jail and Inmate Information, Shelby County Sheriff's Office

---

[1] Unless otherwise noted, these facts are undisputed and are taken from the Parties' undisputed material facts or were admitted in Defendant's Answer to the Amended Complaint.

https://www.shelby-sheriff.org/jail-inmate-information.  Defendant Shelby County, Tennessee, maintains and operates the Shelby County Sheriff's Office ("SCSO").  (ECF No. 19 at PageID 130.)  The SCSO operates the Shelby County Jail ("SCJ").  (Id.)  SCJ has an issue with violence in its facility.  (ECF No. 52 at PageID 840, ECF No. 41-4 at 42.)  In his Rule 30(b)(6) deposition, Assistant Chief Jailer George Porter Askew, Jr., estimated that in 2021 alone, between 2,400 and 5,500 inmate-on-inmate assaults took place.  (ECF No. 46 at PageID 807.)   SCJ's inmate-on-inmate violence problem has been increasing since 2019.  (Id.)

Despite having approximately ten percent of the population of the Tennessee state prison system, Tennessee Department of Corrections ("TDOC"), SCJ, a county jail, by itself, has more inmate-on-inmate assaults per year than the entirety of the state system.  (Id. at PageID 807–08.)  There is no facility in TDOC's system that has experienced the number and degree of inmate assaults for the years of 2021 and 2022 as has the SCJ.  (Id. at PageID 808.)  SCJ reported the following number of inmate-on-inmate assaults: 2019 – 505 assaults; 2020 – 462 assaults; 2021 – 527 assaults; 202[2]² – 565 assaults.  (Id. at PageID 808.)  TDOC's 2022 Statistical Abstract, which gathered information for one full year from all fourteen of Tennessee's prisons combined, placed the total inmate-on-inmate assaults both with and without weapons as only 574.  (Id.)  The total number of inmate-on-inmate assaults at SCJ is within ten percent of the total number of inmate-on-inmate assaults for the calendar years 2021 and 2022 for all fourteen of Tennessee's state prisons combined.  (Id.)  Although the County acknowledges that there is less violence within the state prison system, the County has not compared its operation with that of TDOC.  (Id.)

---

² Ragland's Additional Statement of Undisputed Facts lists the number of inmate assaults in 2020 twice with two different figures.  To support this fact, Ragland cites to the supplemental report of Cameron K. Lindsay, which shows that there were 565 assaults in 2022.

Staffing issues are contributing to the high inmate-on-inmate violence at the Jail.  (Id. at PageID 808.)  When SCJ is fully staffed, it employs approximately 1,100 security personnel. (Id. at PageID 805.)  Shelby County is aware of the dire need for hiring within the Corrections division.  (ECF No. 46 at PageID 807.)  To increase interest in working for the division, Shelby County has reduced the age requirement for corrections deputies from twenty-one to eighteen years of age, implemented a $5,000 signing bonus, increased starting pay for corrections deputies, and incentivized officers to defer their retirements.  (ECF No. 45 at PageID 802.)

Despite the effort to increase the pay of corrections officers, there is still a disparity in compensation between Shelby County Patrol deputies (law enforcement) and Shelby County Correction Division officers, both of whom are hired from the same talent pool.  (Id. at PageID 807; ECF No. 41-4 at Page 30.)  After three years on the job, a Shelby County Patrol deputy makes a base pay of $72,024.96, while a Shelby County Sheriff's corrections officer makes $50,000 for the same amount of on-the-job experience.  (ECF No. 46 at PageID 807.)  Indeed, a Shelby County Sheriff's corrections officer base salary tops out at $58,506 after five years of experience.  (Id.)  A Memphis City Police Officer II receives $66,323.71 upon their three-year anniversary.  (Id.)

SCJ has policies relevant to this matter. First, it has a "systematic contraband mitigation process," formalized in a written policy and a formal procedure for cell searches.  (ECF No. 45 at PageID 802–03.)  As a result of an agreement with the Department of Justice, Shelby County also implemented a direct supervision model for inmates.  (Id. at PageID 805.)  Shelby County policy requires a direct supervision model for inmates that the jail classifies as high-risk.  (Id.)

However, for the two years prior to 2021, SCJ had shifted toward an indirect supervision model because of understaffing.[3]  (Id.)

## II.    The Attack on Ragland

Cordero Ragland and Drew Johnson ("Inmate Johnson") were pre-trial detainees who were housed together in the 4th Floor P-Pod of the SCJ beginning on November 23, 2021.  (ECF No. 41-1 at PageID 465; ECF No. 19 at PageID 131, 140.)  Shelby County was aware that Inmate Johnson had a violent record at the time of his incarceration at SCJ, which included arson, violent assaults on both guards and other inmates, and the murder of his former cellmate. (ECF No. 46 at PageID 804.)  The County was aware that Inmate Johnson was dangerous.  (Id.)

Shelby County placed Inmate Johnson in general population housing, with a classification of  "9 – High Maximum."  (Id. at PageID 804; ECF No. 41-1 at PageID 465.) Ragland had the same classification.  (ECF No. 41-1 at PageID 465.)  Ragland asserts that, based on Inmate Johnson's history, Shelby County could have classified him as either "high risk" or as a "special management inmate."  (Id. at PageID 804–05.)  Shelby County does not dispute that "these housing options are available based on the stated criteria in the referenced policy."  (ECF No. 52 at PageID 836.)  Defendant also does not dispute that inmates classified as "high risk" are

---

[3] To support this statement, Plaintiffs cite to Assistant Chief Askew's deposition.  In his deposition, he explains the difference between a direct and indirect supervision model as follows:

A direct supervision model is when we have a staff member who is assigned inside each housing to monitor the activities of the . . . inmates in the housing unit.  That staff member is assigned to that housing unit for a shift. . . . Indirect supervision model is when we have . . . a staff member who's responsible for the supervision of several housing units.  And that person is assigned to make our security rounds on a . . . specific time period.

(ECF No. 41-4 at 12.)

housed and supervised according to the Administrative Segregation policies.  (ECF No. 46 at PageID 805.)

On the day of the incident, December 21, 2021, SCJ had between 350 and 360 vacant security positions.  (ECF No. 52 at PageID 837; ECF No. 41-4 at Page 14.)  That day, only three officers were assigned to cover the entire fourth floor, which includes nine individual pods.  (ECF No. 46 at PageID 806.)  Deputy Latesha Johnson ("Deputy Johnson") was assigned to cover three pods alone, including "P" pod where Ragland and Johnson were housed.  (Id.)  Although she was supposed to conduct rounds of the pods every thirty minutes, she did not do so.  (Id.)  She was supposed to be implementing an indirect supervision model for her assigned pods, however she testified that she had never been trained on indirect supervision.  (Id.)

That day, Ragland was in the common area of his assigned pod when suddenly, and without any apparent provocation, Inmate Johnson attacked him with a pillowcase or sheet filled with concrete pieces.  (ECF No. 19 at PageID 134; ECF No. 24 at PageID 414.)  Inmate Johnson's attack on Ragland, from the first blow to the last, was approximately thirteen seconds.  (ECF No. 45 at PageID 801–02.)  Deputy Johnson responded to the disturbance within thirty seconds.  (Id.)  Deputy Johnson called a "Code White"[4] approximately fifty-five seconds after Inmate Johnson's first strike to Ragland.  (Id.)  Deputy Johnson was physically present inside the pod to intervene within sixty seconds of Inmate Johnson's first strike.  (Id.)  Upon discovering Ragland injured on the floor, she called a "Code Blue".[5]  (Id.)  Several other officers responded a few seconds later, and Inmate Johnson was escorted away within one-hundred twenty seconds of

---

[4] A Code White indicates an emergency that causes officers to respond as soon as possible.

[5] A Code Blue indicates a medical emergency, which causes medical personnel to respond as soon as possible.

the first strike.  (Id.)  After the incident, Deputy Johnson's actions in connection with this incident were investigated by the Bureau of Professional Standards and Integrity, and, as a result, she was given a ten-day suspension without pay.  (Id.)

Before December 21, 2021, there had been no incidents, threats, or issues between Ragland and Inmate Johnson either during the period they were assigned to the same housing unit or before they were together.  (ECF No. 41-1 at PageID 465.)  The Jail maintains "Keep Separate" lists for all inmates, based on gang affiliation or a history of incidents, reports, or threats. These lists allow the Jail to track known issues between inmates, and to help minimize inmate conflicts by "keeping them separate."  (Id. at PageID 465–66.)  As of December 21, 2021, Inmate Johnson was not present on Ragland's "Keep Separate" list, and Ragland was not present on Inmate Johnson's.  (Id. at PageID 466.)

Ragland filed suit against Shelby County on December 20, 2022 (ECF No. 1), and filed an Amended Complaint on February 14, 2023 (ECF No. 14).  In his Amended Complaint, Ragland alleges violations of 42 U.S.C. § 1983, arguing that Shelby County, "acting under color of state law, by and through the employees, agents and assigns of the Shelby County Sheriff's Office and of the Shelby County Jail, acting with deliberate indifference, violated the constitutional rights of Plaintiff secured by the Eighth and Fourteenth Amendments to the U.S. Constitution, by failing to protect him from violence and harm from the substantial risk, inmate Drew Johnson posed to Plaintiff and other similarly situated inmates." (ECF No. 19 at PageID 139.)

Shelby County seeks summary judgment, arguing, that, in the absence of an underlying constitutional violation (as opposed to possible mere negligence), a municipality cannot be held liable under 42 U.S.C. § 1983.  (ECF No. 41-2 at PageID 468.)   Shelby County asserts that, even

if there was a constitutional violation, Ragland can submit no evidence that the violation was the result of a policy, practice, custom, or act by an official policy-maker sufficient to establish liability on its part.  (Id.)

In his response, Ragland agrees that no Shelby County employee is individually liable, but instead argues that the County can still be held liable independent of individual liability. (ECF No. 44 at PageID 671–72.)   He asserts that "Shelby County's chronic understaffing/overcrowding of the Jail is a custom or de facto policy that prevents adequate supervision of the prisoners and pretrial detainees housed therein and places their safety in jeopardy."  (ECF No. 19 at PageID 134–35.)

In its reply, Shelby County argued that Ragland has failed to show a clear and persistent pattern of misconduct that rises to the level of a Monell custom.  (ECF No. 51 at PageID 832.)[6]

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party can prove the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the non-moving party's cause.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  While the court views all evidence and factual inferences in a light most favorable to the non-moving party, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

---

[6] On April 12, 2024, Ragland filed a Notice of Additional Authority in support of his response to Shelby County's Motion for Summary Judgment.  (ECF No. 59.)  Shelby County filed its response to that Notice on April 17, 2024.  (ECF No. 64.)

The movant has the initial burden of "demonstrate[ing] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The burden then shifts to the non-moving party to go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. Id. at 324 (quotations omitted). Ultimately, in evaluating the appropriateness of summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52.

## ANALYSIS

Section 1983 allows plaintiffs to sue for deprivations of "any rights, privileges, or immunities secured by the Constitution and laws" by state or local officials acting under color of state law. 42 U.S.C. § 1983. It is not a stand-alone cause of action, but rather provides a cause of action for violations of rights secured by other statutes or the Constitution. See Baker v. McCollan, 443 U.S. 137, 140 (1979). When a § 1983 claim is made against a municipality such as Shelby County, the Court must analyze two distinct issues: (1) whether Plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality as an entity is responsible for that violation. Scott v. Wittaker, No. 1:23-CV-P172-JHM, 2024 WL 1837978, at *3 (W.D. Ky. Apr. 26, 2024) (citing Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992)). A municipality can be held responsible if a plaintiff was deprived of a constitutional or statutory right as a direct result of "a policy, procedure, or custom" of the municipality. City of Canton v. Harris, 489 U.S. 378, 385 (1989).

In its motion, Shelby County asserts that the undisputed facts show that Ragland's § 1983 claim fails as a matter of law because "he cannot show that his injuries resulted from a constitutional violation, rather than a[t] most mere negligence." (ECF No. 41-2 at PageID 471.)

8

Further, Shelby County argues that, even if there were a constitutional violation, Ragland "cannot show that such a violation was the result of a policy, practice, or custom of Shelby County. See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). As discussed below, there is a genuine dispute of material fact as to whether a constitutional violation occurred and whether Shelby County's failure to remedy its unsafe jail conditions constitutes a custom of deliberate indifference to inmate-on-inmate violence. Therefore, Defendant's Motion for Summary Judgment is **DENIED**.

## I.      Constitutional Violation

Shelby County first argues that Ragland cannot show that his injuries resulted from a constitutional violation because no individual employee of Shelby County was deliberately indifferent. (ECF No. 41-2 at PageID 471.) Ragland agrees that no Shelby County employee is individually liable, but instead argues that the County can still be held liable independent of individual liability. (ECF No. 44 at PageID 671–72.) He asserts that his clearly established constitutional right to be free from deliberate indifference to inmate-on-inmate violence was violated. (Id.) As discussed below, in unique circumstances, a municipality can be found liable even absent an individual tortfeasor and, here, there are genuine issues of material fact as to whether Shelby County was deliberately indifferent to inmate safety.

### A.      Municipal Liability Absent Individual Liability

Typically, a § 1983 violation is predicated on an individual's unconstitutional conduct. However, a municipality can be held liable even when there is no constitutional violation by an individual officer. See Grote v. Kenton Cnty., 85 F.4th 397, 414 (6th Cir. 2023). While the Supreme Court stated in City of Los Angeles v. Heller, that a damages award against a municipality is unwarranted "based on the actions of one of its officers when in fact the jury has

concluded that the officer inflicted no constitutional harm," 475 U.S. 796, 799 (1986) (per curiam). Heller does not preclude a finding of municipal liability where constitutional harm has nonetheless "been inflicted upon the victim" and the municipality is responsible for that harm. See Grote 85 F.4th at 414 (6th Cir. 2023); Epps v. Lauderdale Cnty., 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, J., concurring); see also, e.g., North v. Cuyahoga Cnty., 754 F. App'x 380, 389–90 (6th Cir. 2018) (surveying the approaches of several judicial circuits); Fairley v. Luman, 281 F.3d 913, 917 (9th Cir. 2002) (per curiam) ("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983."); Speer v. City of Wynne, 276 F.3d 980, 986 (8th Cir. 2002) ("Heller should not be read to require a plaintiff to show more than that a governmental policy or custom was the 'moving force' that led to the deprivation of his constitutional rights, the foundation for municipal liability.").

The Sixth Circuit has not directly addressed whether a municipality can be held liable absent a constitutional violation by an individual, and its discussions in dicta "ha[ve] not been a model of consistency." Grote, 85 F.4th at 414. Defendants cite to Bowman v. Corrections Corp. of America, 350 F.3d 537 (6th Cir. 2003), for the proposition that direct municipal liability cannot exist without a municipal employee being found liable in their individual capacity. (ECF No. 51 at PageID 826.) However, in that case, the Sixth Circuit did not directly address that question.

In Bowman, a detainee was treated by jail medical providers but ultimately died. 350 F.3d at 545. The plaintiff alleged that the defendants' policies and failure to investigate were themselves unconstitutional and led to this death. Id. The jury found that the two doctors who treated the detainee did not act with deliberate indifference to the detainee's medical needs and,

therefore, did not violate his constitutional rights.  Id. at 544.  As a result, the district court found

that the municipal defendant was not liable either.  On appeal, the Sixth Circuit upheld the

decision, reasoning that "the constitutional violation claimed either occurred or did not occur as a

direct result of the actions of at least one person."  Id. at 546.  As a result, it was not necessary to

reach the question of whether direct municipal liability can exist without individual liability.  Id.

However, in dicta, the court suggests that municipal liability cannot exist without individual

liability.  See id. at 545 ("[T]he district court held that without a constitutional violation of

Anthony's Eighth Amendment right by Dr. Coble or Warden Myers, CCA cannot be held liable

for its policy, even if it were to encourage deliberate indifference.  We agree.")

        More recently, however, the Sixth Circuit discussed this issue in Grote v. Kenton County,

Kentucky., 85 F.4th 397, 414 (6th Cir. 2023).  There, the court acknowledged that, "[i]n many

cases, a finding that no individual defendant violated the plaintiff's constitutional rights will also

mean that the plaintiff has suffered no constitutional violation."  Grote, 85 F.4th at 414 (quoting

North v. Cuyahoga Cnty, 754 F. App'x 380, 390 (6th Cir. 2018)).  However, in cases of

constitutional violations that result from systematic problems related to official customs,

policies, or practice, a municipality can still be held liable.  Id. ("[W]hen the constitutional harm

complained of relates to lack of action due to a failure to train, the municipality may still be

liable."); see also Daniel v. Cook Cnty., 833 F.3d 728, 734 (7th Cir. 2016) (considering whether

municipality was liable for constitutional violation despite inability to hold any one doctor

responsible because the plaintiff "contends . . . that the delays and confusion that caused his

injury were caused by systemic problems in the health care system for the Cook County Jail that

reflect deliberate indifference to inmates' health needs as a matter of official custom, policy, or

practice").  Following the dicta in Grote, "it is proper to consider possible constitutional

violations committed by a municipality qua municipality, even in the absence of a showing of a constitutional violation of any one individual officer."  85 F. 4th at 414.  Shelby County can be found liable absent a violation by an individual officer.

      B.       <u>Deliberate Indifference to Inmate Safety</u>

Here, Plaintiff alleges that Shelby County exhibited deliberate indifference to inmate safety and failed to protect him from assault by another inmate.  The Eighth Amendment imposes on prison officials "an affirmative duty to protect inmates from violence perpetrated by other prisoners." <u>Wilson v. Yaklich</u>, 148 F.3d 596, 600 (6th Cir. 1998).  Pretrial detainees are entitled to the same Eighth Amendment rights as other inmates under the Fourteenth Amendment's due process clause.  <u>Miller v. Calhoun Cnty</u>., 408 F.3d 803, 812 (6th Cir. 2005) ("Although the Eighth Amendment's protections apply specifically to post-conviction inmates, the Due Process clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees as well.")

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994) (citation omitted).  However, not every injury "suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." <u>Id.</u> at 834.  "[A] prison official may be held liable under the Eighth Amendment . . . only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Id.</u> at 847.  Unlike a deliberate indifference claim brought under the Eighth Amendment, under the Fourteenth Amendment, "officers can face liability even if they did not <u>actually know</u> of a risk of harm to a pretrial detainee.  Pretrial detainees need only prove that the officers <u>recklessly disregarded</u> a risk so obvious that they either knew or should have known

12

of it." Lawler v. Hardeman Cnty., 93 F.4th 919, 927 (6th Cir. 2024) (citing Helphenstine v. Lewis Cnty., 60 F.4th 305, 317 (6th Cir. 2023)); see Westmoreland v. Butler Cnty., 29 F.4th 721, 728 (6th Cir. 2022) ("[A] pretrial detainee establishes deliberate indifference by proving 'more than negligence but less than subjective intent—something akin to reckless disregard.")

To establish liability, a plaintiff must show that the risk of harm is sufficiently serious, and that prison officials acted "deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Helphenstine, 60 F.4th at 317 (quoting Brawner v. Scott Cnty., 14 F.4th 585, 591 (6th Cir. 2021)).  Thus, to survive summary judgment, Ragland must show that there is a genuine dispute of material fact that: (1) the County "made an intentional decision with respect to the conditions under which plaintiff was confined;" (2) those conditions put Plaintiff "at substantial risk of suffering serious harm;" (3) the County "did not take reasonable available measures to abate that risk," although a reasonable person would have "appreciated the high degree of risk involved— making the consequences of [the County's] conduct obvious;" and (4) the County caused Plaintiff's injuries by not taking those reasonable measures.  Westmoreland, 29 F.4th at 729. Each element is examined below.

### 1.    *Intentional Decisions*

Ragland argues that the SCJ made several intentional decisions with respect to the conditions under which he was confined.  First, he argues that SCJ deliberately refused to allocate sufficient funds to address the dire staffing shortage at the jail.  (ECF No. 44 at PageID 676.)  To support this assertion, Ragland relies on the pay schedules for Shelby County Patrol Officers ("SCPO"), Shelby County Corrections Officers ("SCCO"), and Memphis Police Department Officers ("MPDO").  (ECF No.  44-3.)  The schedules show the entry level annual

13

salary for each position: SCPO–$47,191.68, SCCO—$ 45,798.00, and MPDO—$50,299.98. (Id.)  After three years of service, the schedules show that each type of officer would make the following amount: SCPO–$72,024.96, SCCO—$ 50,311.44, and MPDO—between $60,139.44 and $66,323.71.  In addition, Ragland cites to the deposition of Assistant Chief Askew, who agreed that "[t]he County has elected to prioritize the benefits package of patrol deputies over that of corrections deputies."  (ECF No. 41-4 at Page 75.)  In response, Shelby County points to its efforts to address staffing levels at the jails, including intensified recruitment efforts, a reduction of the age requirement, a $5,000 signing bonus, and increased starting pay for corrections deputies.  (Id.)

Second, Ragland asserts that the County made the intentional decision to not take any meaningful steps to reduce inmate-on-inmate violence.  In addition to failing to address the lack of staff, SCJ also has not compared its operation to that of TDOC.  In his deposition, Assistant Chief Askew acknowledged "I can't compare with Tennessee Department of Correction, because I'm not familiar with their operation."  (Id. at Page 44.)  Shelby County counters that jails pose challenges that prisons do not, and therefore they are not directly comparable.

Third, Ragland claims that the County made an intentional decision to weigh the charges that Inmate Johnson faced for murdering his cellmate differently than his convictions when calculating his security classification.  (ECF No. 44 at PageID 681.)  On this issue, both Ragland and Shelby County submitted reports from corrections experts.  Ragland's expert is Cameron K. Lindsay, who has served as the warden of five separate facilities.  (ECF Nos. 44-1 & 44-2.) Shelby County retained John W. Johnson, Ph.D., a correctional administrator with more than twenty-nine years of experience (ECF No. 41-5).

Dr. Johnson acknowledges that SCJ weighs charges and convictions differently, stating "[r]egarding Inmate Drew Johnson's indictment in Mississippi, filed on February 17, 2017, and its impact on his classification process, SCJ staff acknowledged the document as a charge during the booking and classification processes.  Undisposed charges from another jurisdiction are weigh[]ed differently than convictions in the classification tool SCJ uses."  (ECF No. 41-5 at PageID 622.)  Lindsay, disagreed with SCJ's approach, opining that "[o]ffense behavior, not convictions, is what must be considered in the process of inmate classification."  (ECF No. 44-2 at PageID 718.)

Viewed in the light most favorable to Ragland, the evidence on which Ragland relies raises questions of fact as to whether SCJ made intentional decisions with respect to the conditions under which he was confined.

### 2.  *Substantial Risk of Serious Harm*

To prove the second element, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Id.  Ragland argues that "the critical understaffing at the Shelby County Jail, combined with the lack of an inmate classification system [and] a lack of adequate inmate and staff supervision" created a substantial risk of serious harm.  (ECF No. 44 at PageID 671.)  Shelby County counters that Ragland must show that "Johnson was specifically a danger to Plaintiff," and cannot make out a failure to protect claim simply based on Johnson's background.  (ECF No. 41-2 at PageID 477.)

It is undisputed that SCJ has been understaffed since at least 2019.  (ECF No. 52 at PageID 837; ECF No. 41-4 at Page 14.)  In his deposition, Assistant Chief Askew stated that SCJ has approximately 1,100 security positions when it is fully staffed.  (ECF No. 41-4 at Page 13.)  At the time of Ragland's attack, there were between 350 and 360 vacancies.  (Id. at Page 14.)

15

Further, it is undisputed that inmate-on-inmate violence regularly occurred at SCJ. Askew stated in his deposition that between 2,400 and 5,500 inmate-on-inmate assaults occurred in 2021.  (Id. at Page 42.)  He also stated that, although SCJ has approximately ten percent of the population of the entire TDOC system, SCJ alone had more inmate-on-inmate assaults per year than the entire state prison system.  (Id.)

Ragland and the County's experts disagree on whether Inmate Johnson should have been housed in administrative segregation.  (ECF No. 44 at PageID 681.)  However, it is undisputed that Shelby County was aware that Inmate Johnson had a violent record at the time of his incarceration at SCJ, which included arson and violent assaults on both guards and other inmates, and he was charged with the murder of his former cellmate.  (ECF No. 46 at PageID 804.)

Shelby County argues that an inmate's violent history is not sufficient to show substantial risk, "rather there needs to be some indication of a personal risk to **the plaintiff**."  (ECF No. 41-2 at PageID 478.)  In support, the County cites to Davis v. Chorak, No. 22-1839, 2023 WL 2487339 (6th Cir. Mar. 14, 2023).  In Davis, the Sixth Circuit upheld the district court's decision to grant a motion to dismiss a failure to protect claim because the plaintiff had failed to allege facts to suggest he was personally at substantial risk of assault.  Id. at *3.  The allegations regarding the defendant's dangerousness included his prior assaultive behavior in connection with a prior sex offense, a pending unarmed robbery charge, and prior jail management issues. Davis v. Chorak, 624 F. Supp. 3d 870, 881 (W.D. Mich. 2022).

However, the Davis court did not hold that an inmate's history of violence is never sufficient to create a substantial risk of harm.  Indeed, the Sixth Circuit has "repeatedly observed that the risk of violent attack by fellow prisoners known to have previously committed serious assaults, absent precautions, can create a substantial risk of serious harm.  Schoonover v. Rogers,

16

No. 21-3970, 2022 WL 12258998, at *6 (6th Cir. Oct. 21, 2022) (citing Richko v. Wayne Cnty., 819 F.3d 907, 916 (6th Cir. 2016) (holding that the risk of assault from a violent, mentally disturbed cellmate satisfied the substantial risk of harm requirement); Young v. Campbell Cnty., 846 F. App'x 314, 321 (6th Cir. 2021) (holding that the evidence of a violent inmate's attack that occurred after a prison failed to reclassify him satisfied the substantial risk of harm requirement requirement)).

Here, Inmate Johnson's violent history has been especially serious within the jail setting. He was charged with murdering a former cellmate in 2017, he assaulted three inmates between September 2018 and May 2019, he set fire to his cell in SCJ twice in May 2019, he was found in possession of a deadly weapon on June 24, 2021, and he assaulted a deputy jailer on October 8, 2021. (ECF No. 19-5.)  Therefore, inmates with whom he was housed, including Ragland, faced personal risk.  Considering the evidence in the light most favorable to Ragland, there is a question of fact as to whether a substantial risk of serious harm existed at the jail.

3.    *Failure to Take Reasonable Measures*

The third element of a pretrial detainee's failure to protect claim is that the defendant did not take reasonable available measures to abate the substantial risk of serious harm, even though a reasonable defendant in the circumstances would have appreciated the high degree of risk involved and the obvious consequences of the defendant's conduct.  Westmoreland, 29 F.4th at 730.  A pretrial detainee need not prove subjective elements about an officer's actual awareness of the level of risk, but he must prove the officer was more than merely negligent; the officer must have acted with "reckless disregard" in the face of "an unjustifiably high risk of harm."   Id.

It is undisputed that the County knew of its issues concerning understaffing and inmate-on-inmate violence.  (ECF No. 46 at PageID 808.)  In fact, Shelby County asserts it has

attempted to remedy the former issue by, as previously discussed,  reducing the age requirement for corrections deputies from twenty-one to eighteen years of age, implementing a $5,000 signing bonus, increasing starting pay, and incentivizing officers to defer their retirements.  (ECF No. 45 at PageID 802.)  The County also notes other measures it implemented to maintain a safe jail, including a "systematic contraband mitigation process," formalized in a written policy, and a formal procedure for cell searches.  (Id. at PageID 802–03.)  Finally, the Jail maintains "Keep Separate" lists for all inmates, based on gang affiliation, or a history of incidents, reports, or threats.  This list allows the Jail to track known issues between inmates, and to help minimize inmate conflicts by "keeping them separate."  (ECF No. 41-1 at PageID 465–66.)

It is also undisputed that the County was aware of Inmate Johnson's history of violence and did not place him in a segregated unit.  (Id. at PageID 804; ECF No. 41-1 at PageID 465.)  Lindsay, Ragland's expert, opined that "it would be crystal clear to any reasonably objective correctional worker that Drew Johnson, because of his history of extreme violence, required a greater level of security than that afforded in the general population of any jail that houses pretrial detainees."  (ECF No. 44-1 at PageID 704.)

Viewed in the light most favorable to Ragland, the evidence raises questions of fact as to whether SCJ took reasonable available measures to abate the substantial risk of serious harm.

### 4.  *Causation*

The fourth element is whether Shelby County caused the plaintiff's injuries by not taking reasonable measures.  Ragland's expert provided the following opinion on the cause of Ragland's injuries:

> Defendant Shelby County, through the actions and inactions of its staff, abjectly failed to provide Plaintiff Cordero Ragland a safe environment and reasonably protect him from harm.  Conversely, their actions and lack of actions directly [led] to the assault of Johnson on Cordero.

. . .

> Unfortunately, at least from 2000 through, 2021, the Shelby County Jail was understaffed, under supervised, poorly led, and failed to follow the minimum standards within the profession of corrections, such as implementing and adhering to a custody classification program and adequately supervising inmates and staff. Moreover, the Jail failed to adhere to its own policies and procedures, all of which culminated in the catastrophic event that was the assault of Drew Johnson on Cordero Ragland.

(ECF No. 44-1 at PageID 702, 705–06.)  Ragland has at least raised a genuine dispute of material fact as to whether Shelby County caused his injuries by failing to remedy unsafe jail conditions.

*       *       *

For the reasons stated above, Ragland has raised a genuine dispute of material fact as to whether there is a constitutional violation.  The Court next considers whether the violation was the result of a "policy, procedure, or custom" of the municipality.

## II.     Policy, Procedure, or Custom

When suing a municipality under § 1983, a plaintiff must prove that he was deprived of his constitutional or statutory rights as a direct result of "a policy, procedure, or custom" of the municipality.  City of Canton v. Harris, 489 U.S. 378, 385 (1989).  "A litigant can show a policy or custom through reference to: (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations."  Agema v. City of Allegan, 826 F.3d 326, 331 (6th Cir. 2016).

Ragland argues, "that although SCJ has promulgated written policies based on the standards set forth by the American Corrections Association, they do not, as a matter of actual practice, follow these policies and have a pattern, practice, custom, and de facto policy of grossly

19

understaffing the Jail's housing units on a regular basis."[7]  (ECF No. 19 at PageID 126.)

According to Ragland, this custom caused Ragland's injuries.[8] As discussed below, the Court

finds that there is a dispute of material fact as to whether the County's custom of failing to

address the overcrowded and understaffed jail caused Ragland's injuries.

In cases where no formal policy exists, "the critical question is whether there is a

particular custom or practice that 'although not authorized by written law or express municipal

policy, is so permanent and well settled as to constitute a custom or usage with the force of

law.'" Jones v. Muskegon Cnty., 625 F.3d 935, 946 (6th Cir. 2010) (quoting Ford v. Cnty. of

Grand Traverse, 535 F.3d 483, 495–97 (6th Cir. 2008)).  To state a municipal liability claim

under an "inaction" theory, Ragland must establish:

(1) the existence of a clear and persistent pattern of inmate-on-inmate violence;

(2) notice or constructive notice on the part of the County;

(3) the County's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

(4) that the County's custom was the "moving force" or direct causal link in the constitutional deprivation.

---

[7] Although Shelby County argues that SCJ's written policies are not unconstitutional, it does not appear that Ragland argues to the contrary.  Instead, Ragland contends that SCJ's failure to comply with these policies resulted in his injuries.  To the extent that  a claim that the written policies are unconstitutional was intended, the undisputed facts support that such a claim would fail as a matter of law.  Thus, the trial in this matter should not include evidence regarding the constitutionality of SCJ's written policies.

[8] In the alternative, Ragland argues that Shelby County acted with deliberate indifference in failing to "hire, train, or supervise its officers, agents and employees, with respect to their responsibilities in ensuring they follow the SCJ's classification procedures, staffing requirements, isolation and monitoring inmates[.]"  (ECF No. 19 at PageID 143.)  Shelby County addresses Ragland's failure-to-train theory for the first time in its Reply.  (ECF No. 51 at PageID 828.)  However, arguments that are raised for the first time in reply briefs are waived.  Palazzo v. Harvey, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019).  Thus, the Court will not evaluate whether summary judgment is warranted on Ragland's failure-to-train theory.

See Claiborne Cnty., 103 F.3d at 508.  However, "[a] plaintiff cannot establish a custom solely by pointing to the facts of his own case"; rather, he must show "several separate instances" of similar misconduct.  Payne v. Sevier Cnty., 681 F. App'x 443, 446 (6th Cir. 2017) (quoting Thomas v. City of Chattanooga, 398 F.3d 426, 433–34 (6th Cir. 2005)); accord Daniel, 833 F.3d at 734 ("We have said in general terms that an inmate can meet this burden by offering competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event).") (citation and internal quotation marks omitted).

Here, Ragland has presented evidence that raises a genuine dispute of material fact as to whether Shelby County's failure to remedy unsafe jail conditions resulting in increasing numbers of inmate-on-inmate assaults amounts to a custom of deliberate indifference.  As to the first factor, it is undisputed that inmate-on-inmate violence is pervasive in SCJ.  (ECF No. 52 at PageID 840; ECF No. 41-4 at 42.)  Ragland points to inmate assault reports and testimony from Assistant Chief Askew that show that there was an increasing number of inmate-on-inmate attacks.  Moreover, when compared with other detention facilities in the state, the violence at SCJ dwarfs the violence elsewhere.

The second factor, whether the County was on notice, is also satisfied.  Assistant Chief Askew acknowledged that 2021 alone, between 2,400 and 5,500 inmate-on-inmate assaults took place.  (ECF No. 46 at PageID 807.)   Further, he stated that the inmate-on-inmate violence problem has been increasing since 2019.  (Id.)  He also stated that he knew that SCJ had more inmate-on-inmate assaults per year than the rest of the TDOC system combined.  (Id. at Page 43.)

As for the third factor, tacit approval of unconstitutional conduct, Ragland argues that SCJ's failure to improve jail conditions regarding understaffing and overpopulation resulted in

the County's violation of its own policies.  In 2000, because of an agreement with the Department of Justice, Shelby County implemented a direct supervision model for inmates. (ECF No. 46 at PageID 805.)  A direct supervision model requires a staff member to be assigned to each housing unit.  (ECF No. 41-4 at 12.)  In contrast, in an indirect supervision model, a staff member is responsible for the supervision of several housing units and makes security rounds on a specific time period.  (Id.)  Shelby County policy requires a direct supervision model for inmates that the jail classifies as high-risk.  (Id.)  However, for the two years prior to 2021, SCJ had implemented an indirect supervision model because of understaffing.  (Id.)  There are too many inmates and too few staff to implement a direct supervision model, leaving high-risk inmates, like Inmate Johnson, supervised according to an indirect supervision model.

Shelby County argues that there was no policy or custom to understaff the Jail, nor was there a policy to ignore the jail's population levels.  (ECF No. 41-2 at PageID 487.)  The County points to their efforts to address staffing levels at the jails, including intensified recruitment efforts, a reduction of the age requirement, a $5,000 signing bonus, and increased starting pay for corrections deputies.  (Id.)  However, given competing evidence, there is an issue of material fact as to whether there was a custom of ignoring unconstitutional jail conditions regarding staffing levels.

In addition, Ragland contends that the County did not address the overpopulation issue by issuing release citations, but it could have under the law.  See Tenn. Code Ann. § 40-7-120(b). Ragland argues that if Sheriff Bonner had exercised this authority, the County may have been able to comply with its direct supervision policy.  (ECF No. 44 at PageID 681.)  Shelby County responds that Sheriff Bonner cannot unilaterally release detainees housed at the Jail because they are booked into the Jail only after bail has been set and/or a mittimus has been issued.  (ECF No.

22

41-2 at PageID 487.)  Thus, there is an issue of material fact as to whether Sheriff Bonner was able to issue release citations to reduce the population to such an extent that a direct supervision model could have been implemented.

Finally, Shelby County argues that Ragland has failed to produce any evidence as to the unconstitutionality of the other incidents of inmate-on-inmate assaults.  (ECF No. 51 at PageID 831.)  The County argues that Ragland has not shown that the assault numbers are high given the size and population of the jail.  (Id. at PageID 832.)  Rather, it asserts that Ragland makes an apples-to-oranges comparison of inmate-on-inmate assault numbers in various TDOC prison facilities.  (Id.)

However, Assistant Chief Askew acknowledges in his deposition that there is an issue of inmate-on-inmate violence in the SCJ and that that issue has been increasing.  (ECF No. 46 at PageID 807.)   Further, Ragland's expert stated that the inmate-on-inmate violence statistics are "outrageously high, the highest that I've ever seen in my entire career for any one correctional facility." (ECF No. 44-2 at PageID 721.)  Considering the evidence in the light most favorable to Ragland, there is enough proof for the question of whether there was a custom of deliberate indifference to jail conditions for the jury to decide.

Regarding the fourth factor, causation, Ragland's expert opined that "Shelby County Jail was understaffed, under supervised," and "failed to adhere to its own policies and procedures, all of which culminated in the catastrophic event that was the assault of Drew Johnson on Cordero Ragland." (ECF No. 44 at PageID 688.)  He stated that the County's "actions and lack of actions directly [led] to the assault of Johnson on Cordero." (Id.)  Ragland has raised an issue of material fact as to whether Shelby County's failure to remedy unsafe jail conditions caused the

violation of Ragland's constitutional rights.  As a result, the motion for summary judgment is **DENIED**.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED** as to Ragland's claim that Shelby County's failure to remedy unsafe jail conditions caused the violation of Ragland's constitutional rights.

**IT IS SO ORDERED**, this 17th day of July, 2024.

s/ Sheryl H. Lipman_____
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE